# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Loren F.,

            Plaintiff,

v.

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

            Defendant.

Case No. 22-cv-2862 (NEB/ECW)

**REPORT AND RECOMMENDATION**

    This matter is before the Court on Plaintiff Loren F.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 11) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Commissioner") Motion for Summary Judgment (Dkt. 13). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying his application for disability insurance and supplemental security income benefits. (*See generally*, Dkt. 1.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I. PROCEDURAL BACKGROUND

    On April 26 and 27, 2018, Plaintiff applied for Disability Insurance under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income Benefits

under Title XVI of the Act, alleging disability as of December 11, 2017. (R. 308, 317.)[1]

His applications were denied initially and on reconsideration. (R. 76-90, 91-104, 110-122, 121-35.)

Plaintiff requested a hearing, and on July 8, 2021, Plaintiff appeared remotely for a hearing before Administrative Law Judge Nicholas Grey ("the ALJ"). (R. 40-42, 156-57.) The ALJ issued an unfavorable decision on September 29, 2021, finding Plaintiff was not disabled. (R. 10-27.)

Following the five-step sequential evaluation process under 20 C.F.R. §§ 404.1520(a) and 416.920(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since December 11, 2017, the alleged onset date of disability. (R. 15.)

At step two, the ALJ determined that Plaintiff had the following severe

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 9.

[2]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in a substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

impairments: Crohn's disease[3], hip fracture, and left shoulder degenerative joint disease. (R. 16.)  The ALJ determined that Plaintiff's medically determinable mental impairments of bipolar affective disorder and generalized anxiety disorder, when considered singly and in combination, were non-severe.  (R. 17.)  The ALJ determined that Plaintiff had no limitations in two of the four broad functional areas—known as the "paragraph B" criteria, *see* 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(E)(1)-(4)—for the categories of understanding, remembering, or applying information, and interacting with others.  (R. 17.)  The ALJ found that Plaintiff had mild limitations for the categories of concentrating, persisting, or maintaining pace and adapting or managing oneself.  (R. 18.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 20.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following limitations: can exert 20 pounds occasionally and 10 pounds frequently with the upper extremities; limited to standing and walking 3 hours in an 8-hour work day; occasionally climbing, balancing, stooping, kneeling, crouching, and crawling; and ready access to a restroom, and may not work at remote sites or as a driver for instance.

(R. 21.)  The ALJ then found that Plaintiff was able to perform his past relevant work as

---

[3]    "Crohn's disease is a chronic disease that causes inflammation and irritation in [the] digestive tract."  https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/definition-facts (last visited November 13, 2023).

an Administrative Analyst, Dictionary of Occupational Titles ("DOT") 169.167-010, and an Insurance Claim Auditor, DOT 241.267-018. (R. 26.) The ALJ determined that Plaintiff's past relevant work does not require the performance of work-related activities precluded by his RFC. (R. at 26.) As a result, the ALJ deemed Plaintiff not disabled from December 11, 2017, through the date of the ALJ's decision, September 29, 2021. (R. 14, 27.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 2-7.) Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

### A.    Crohn's Disease

Prior to December 11, 2017, the date that Plaintiff alleges he became disabled (R. 358)[4], Plaintiff was diagnosed with Crohn's disease (R. 459). Plaintiff's alleged onset date coincides with his emergency department visit for a Crohn's disease flare. (R. 650-51.) Plaintiff was admitted to the emergency department because of increased diarrhea

---

[4]    Plaintiff's alleged onset date is December 11, 2017, but his Form SSA-3367 also alleges April 10, 2018 as a potential onset date for his Title XVI claims and December 10, 2017 as a potential onset date for his Title II claims. (R. 358.) The Court uses December 11, 2017 as the alleged onset date, as did the ALJ. (*See* R. 13.)

with blood, abdominal pain, and emesis[5]. (R. 650-72.) An endoscopy demonstrated Crohn's disease and findings consistent with inflammatory bowel disease from the sigmoid colon to the cecum and was graded as Mayo Score 3[6], which is severe, but was otherwise normal. (R. 696-99.) Plaintiff was treated with the steroid Prednisone and antibiotics and was discharged in stable condition on December 17, 2017, with a diagnosis of Crohn's disease. (R. 739-43.)

Plaintiff sought treatment for his Crohn's disease from gastroenterologist Jimmy Levine, MD, in February 2018. (R. 755.) Plaintiff reported at that visit that his gastrointestinal ("GI") symptoms had improved, and he had no more blood in his stool since his December 2017 hospitalization. (R. 755.) Dr. Levine noted that Plaintiff's symptoms were likely improved because of the Prednisone treatment and wanted Plaintiff to take both Azathioprine[7] and Stelara[8] to further control Plaintiff's Crohn's disease. (R. 755.) He gave Plaintiff Prednisone in case of a flare. (R. 755.)

---

[5]    Emesis, or vomiting, "is the forceful retrograde expulsion of gastric contents from the body." https://www.ncbi.nlm.nih.gov/books/NBK410/ (last visited November, 13 2023).

[6]    The Mayo Score is a scoring system used to assess disease activity and changes in diseases such as Crohn's disease. https://www.ncbi.nlm.nih.gov/books/NBK539018/ (last visited November 13, 2023).

[7]    Azathioprine is an immunosuppressive agent used in combination with other medications to treat Crohn's disease. https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/azathioprine.pdf (last visited November 13, 2023).

[8]    Stelara is a medication used to treat moderately or severely active Crohn's disease. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/761044lbl.pdf (last visited November 13, 2023).

In March 2018, Plaintiff established care with Physician Assistant Ryan Lill ("PA Hill") to discuss his Crohn's disease. (R. 782-83.) PA Lill stated that Plaintiff had "recovered well" since the December 2017 hospitalization and that Plaintiff reported he had "a fairly good handle on his disease and more flare ups are due to him eating food he knows he shouldn't." (R. 783.) In May 2018, Plaintiff saw PA Lill again, who noted that Plaintiff was starting Stelara, "a new monoclonal antibody medication," that month to help Plaintiff with his Crohn's disease. (R. 789.) The PA found that Plaintiff's affect was broad, his mood was pleasant, he was cooperative with the exam, he had normal judgment and insight, his memory was intact, and he was appropriately groomed. (R. 790.) Plaintiff saw PA Lill again in July 2018, when PA Lill noted that Plaintiff started Stelara and reported "an improvement in how he feels" but that a side effect was four instead of two bowel movements a day, which Plaintiff believed was "mostly from unhealthy eating." (R. 794.) The treatment notes also addressed Plaintiff's anxiety, with PA Lill noting that Plaintiff "denies any panic symptoms and feels his anxiety is fairly well-controlled in general." (R. 794.)

Plaintiff saw Dr. Levine again in July 2018 and Dr. Levine reported that since Plaintiff's December 2017 hospitalization, "[Plaintiff] was much better after getting a prednisone taper." (R. 806.) "A few months went by before he was able to start Stelara. He started to have some more symptoms. He just received his second dose of Stelara. He believes that it is working quite well." (R. 806.) While Stelara was working well, the only thing that Plaintiff reported was "not perfect is that he has 4 stools a day instead of 2." But he had "no more urgency." (R. 806.) Dr. Levine noted that: "[Plaintiff] will

have little bit of abdominal pain associated with stress.  He otherwise reports things are really quite good.  He thinks he would be even better if he could change his diet some, and he hopes to do this.  He has been cigarette free for over a year." (*Id*.)  A CT enterography from September 2018 showed a "2 cm segment of the distal ileum showing mild wall thickening and mild pericolonic fat stranding," which was "compatible with [Plaintiff's] diagnosis of Crohn's."  (R. 810.)

In February 2019, Dr. Levine provided a Medical Source Statement noting that Plaintiff would have the following limitations:

> one to two days a month with significant pain and/or diarrhea that would prevent working; pain or other symptoms significant enough to interfere with attention and concentration one to two days per month; tolerate moderate stress; require unscheduled breaks; miss one to two days of work per month; the impairment would result in "good days" and "bad days"; and as a result of pain and/or diarrhea would likely be absent from work about twice a month.

(R. 817-21).

Plaintiff established care with another doctor, Michael Butner, MD, in July 2019, where he reported that he was "feeling well."  (R. 862.)  His Crohn's disease was "relatively asymptomatic at this time."  (R. 862.)

Plaintiff visited Dr. Levine again in September 2019 and reported that "he [wa]s doing well," and that he had not been hospitalized in about 20 months, which was attributed to Stelara working well along with Azathioprine.  (R. 848.)  Plaintiff reported that he quit smoking and drinking and was walking regularly.  (R. 848.)  He reported having one to three bowel movements a day, where the first was "definitely more

formed," and "[a]bout a third of the time, he has only the stool." (R. 848.) He only had urgency with looser stool. (R. 848.) Dr. Levine noted the Plaintiff was "doing pretty well on the combinations of Azathioprine and Stelara along with exercise, quitting smoking and drinking." (R. 848.) Dr. Levine left Plaintiff's medications unchanged. (R. 848.) In February and March 2020, Plaintiff's treating provider at the rehabilitation facility where Plaintiff recovered from hip surgery in early 2020 indicated that Plaintiff's Crohn's disease was stable on his medications of Stelara and Azathioprine. (R. 23, 1692.)

Plaintiff testified about his Crohn's disease at the July 2021 hearing before the ALJ. (R. 57-60.) He testified that due to Crohn's disease he had urgency and frequency to use the bathroom. (R. 57.) Plaintiff testified that he had "flare-ups" causing him to miss work. (R. 58.) He also testified regarding the bad flare of Crohn's disease in late 2017 requiring hospitalization, and then to two flares of the disease in 2018 and 2019. (R. 58.) He testified that he otherwise had "a few bad days now and then." (R. 58.) On a bad day, Plaintiff needed to use the bathroom four to six times a day and had increased urgency. (R. 59.) He experienced three to four such bad days a month. (R. 59.) Plaintiff also testified that on bad days he had abdominal pain, bloating, gas, lessened appetite, and a lessened ability to concentrate. (R. 59-60.)

B.      **Mental Health Impairments**

The ALJ concluded that Plaintiff's bipolar affective disorder II[9], cyclothymia,[10]

and generalized anxiety disorder were "determinable mental impairments."  (R. 17.)  The

record contains the following information about Plaintiff's mental health impairments:

mental health therapist Katherine Webster's ("Therapist Webster") progress notes from

her treatment of Plaintiff (R. 1226-1538) and her Mental Medical Source Statement,

which includes an introductory letter (R. 822-27); Advanced Practice Registered Nurse

Vicki Dean-Gramlich's mental status reports (R. 1039-1177) and two Mental Medical

Source Statements (R. 828-32; 1539-1542), and progress notes from Plaintiff's Adult

Rehabilitative Mental Health Services ("ARHMS") and employment services

organization, Rise Inc. (R. 1543-1651).  A summary of that record information follows.

Therapist Webster, Plaintiff's individual and group therapist, provided progress

notes from her treatment of Plaintiff from November 2017 through January 2020.  (R.

1226-1538.)  In multiple progress reports, Therapist Webster described Plaintiff as

having a generally full affect; cooperative behavior; and intact attention, memory, insight,

concentration, and judgment.  (*See, e.g.*, R. 1226-52, 1265-94, 1297-03, 1311-37, 1341-

---

[9]      "Bipolar II disorder is defined by a pattern of depressive episodes and hypomanic
episodes. The hypomanic episodes are less severe than the manic episodes in bipolar I
disorder."  https://www.nimh.nih.gov/health/topics/bipolar-disorder (last visited
November 13, 2023).

[10]      Cyclothymia "is defined by recurring hypomanic and depressive symptoms that
are not intense enough or do not last long enough to qualify as hypomanic or depressive
episodes."  https://www.nimh.nih.gov/health/topics/bipolar-disorder (last visited
November 13, 2023).

1536.)  Plaintiff told Therapist Webster that he had been emailing his brother as well as creating podcasts and listening to music to help "shift his depressed mood."  (R. 1228, 1233.)  They also discussed Plaintiff's volunteering at a radio station.  (R. 1239.)

Therapist Webster submitted a Mental Medical Source Statement in March 2019. (R. 822-27.)  Her opinion included an introductory letter in which she wrote: "I believe [Plaintiff's] mental health symptoms have impacted his ability to find employment."  (R. 823.)  She continued "[Plaintiff] experiences social anxiety and he is hesitant to reach out and interact in social situations."  (R. 823.)  She stated that: "[Plaintiff] has days when he feels hopeless and struggles to get out of bed.  Despite these issues, [Plaintiff's] treatment attendance has been good."  (R. 823.)  She stated, "I think he would be capable of maintaining adequate attendance at work.  When considered independently from his physical health, [Plaintiff's] mental health issues would not prevent him from maintaining competitive employment."  (R. 823.)

Therapist Webster then stated in the Medical Source Statement that Plaintiff had moderate limitations in his ability to complete a normal workday and work week, as well as his ability to tolerate normal levels of stress.  (R. 825.)  She opined that Plaintiff would need unscheduled breaks and that Plaintiff would be absent from work about one day per month.  (R. 825.)

In April 2018, Plaintiff established care with Nurse Dean-Gramlich.  (R. 1174-75.) Nurse Dean-Gramlich's mental status reports stem from about April 2018 through December 2019.  (R. 1039-1177.)  Nurse Dean-Gramlich noted after their first medical visit that Plaintiff presented with tension and anxiety exacerbated by his recent then-

incarceration. (R. 1039-1177.) Nurse Dean-Gramlich opined about Plaintiff's anxiety and depressive episodes in which he "became isolative, quit working, anhedonia, depressed thinking and constant thoughts of suicide." (R. 1039-1177.)

Nurse Dean-Gramlich's progress reports noted the following about Plaintiff's next three visits:

5/23/2018
Patient presents with improved depression, coping and feeling kinder to self. Patient endorses worsening anxiety, exacerbated by sobriety, being around people all the time, anxiety has worsened. We will start propranolol for anxiety, panic, physical response, we will consider Buspar for anxiety and identify thoughts and responses.

7/18/2018
Patient reports increased depressed- mood and feels sadness- sorrow and loss. He is able to express perceptions and frustrations- states he has been - able to reframe for coping. Patient has shown marked improvement of anxiety irritability and focus with propranolol- he is surprised by the effectiveness. Patient states he will see PCP due to 3 medications for HIN. He will plan to speak with PCP about adjusting medications, education orthostatic hypotension, anxiety and mood. Increase Sertraline 150mg for depression and anxiety. Patient education provided. Long term management education for sobriety and mood/coping and functioning, change in brain and mind with sobriety along with medications.

9/19/2018
Patient endorses marked worsening of depression, apathy and sadness. Patient identifies "I hate things." Patient feels hopelessness and despondency. His PCP has discontinued some meds as cholesterol and BP have markedly improved with abstinence from alcohol. We will consider Effexor XR 37.5mg - 75mg for depression, anxiety and sadness. We will start with Melatonin for sleep and recover sleep and then consider Effexor- and we will consider mirtazapine for sleep and depression (instead of Effexor). Improve emotional engagement. Patient is able to identify "I won't feel this way forever" patient endorses - DBS skills are effective.

(R. 1147-48.) Over the next three months, Nurse Dean-Gramlich reported that Plaintiff improved in October 2018 and "ha[d] been able to attach to hope and feel more

connected." (R. 1139.)  He still reported feeling anxiety, fear, and shame, but had been making progress in therapy and on medication.  (R. 1139.)  In November 2018, Nurse Dean-Gramlich noted that Plaintiff's anxiety had worsened again but that he had some improvement with depression and his mood.  (R. 1131.)  By December 2018, nurse Dean-Gramlich reported that Plaintiff had "marked improvement of anxiety" and that he stated: "I think I am doing better, and the medications are working at least I am aware of positives."  (R. 1123.)

In February 2019, Nurse Dean-Gramlich reported that Plaintiff was having "severe mood instability," which she attributed to his medications.  (R. 1114.)  She reported that the medications would be modified.  (*Id*.)  Over the next few months nurse Dean-Gramlich noted that Plaintiff's mood improved, with "marked improvement" by April 2019.  (R. 1096, 1105.)  Nurse Dean-Gramlich further reported that Plaintiff had "decreased dysregulation and decreased agitation [and] depressed mood" as well as "marked improvement of functioning, education- counseling- social connections, self-worth and mood recovery… [and] marked improvement of hope."  (R. 1096.)

From May 2019 until December 2019, Nurse Dean-Gramlich's treatment notes include a diagnosis of bipolar affective disorder II and generally state that, despite a few ups and downs in mood, Plaintiff "has shown consistent and significant improvement of mood."  (R. 1087, 1079, 1070, 1063, 1054, 1039-45.)  She reported that medications had been effective to the extent that, "[Plaintiff] processes with shock, surprise, and gratitude that his mood and functioning are markedly improved- patient endorses marked decrease of depression."  (R. 1087.)  During this timeframe, Nurse Dean-Gramlich's notes

repeatedly contained the following sentence: "[Plaintiff] reports surprise that depression can lift, 'I have never ever gone this long without crushing paralyzing depression.'" (R. 1087, 1079, 1070, 1063, 1054, 1039-45.)

Nurse Dean-Gramlich submitted two Mental Medical Source Statements, one in March 2019 and the other in February 2020. (R. 828-32; 1539-1542) In March 2019, Nurse Dean-Gramlich opined that Plaintiff had moderate limitations in: the ability to sustain an ordinary routine without special supervision; the ability to complete a normal work day and work week, without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to ask simple questions or request assistance; the ability to tolerate normal levels of stress; and would be likely to miss about three days of work per month; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 830-31.) Nurse Dean-Gramlich then opined that Plaintiff had "marked limitations in the ability to work in coordination with, or proximity to, others without being distracted by them and accept instructions and respond appropriately to criticism from supervisors. (R. 830.)

Then, in February 2020, Nurse Dean-Gramlich opined that Plaintiff had moderate limitations: in the ability to interact with the public, supervisors, or co-workers; the ability to carry out detailed instructions; and the ability to respond appropriately to work pressures in a usual work setting. (R. 1540-41.) She opined further that Plaintiff had marked limitations in responding appropriately to changes in a routine work setting. (R. 1541.)

The progress notes from Plaintiff's meetings with clinicians from ARHMS and Rise Inc., start in June 2018 and continue until February 2020.  (R. 1543-1651, *see* 1550, 1650).  These notes generally show improvement over time in Plaintiff's emotional stability, awareness of stressors, and healthy coping mechanisms.  (R. 1543-1651.)  In late 2019, the clinician discussed how Plaintiff's podcast made him "very proud of himself for the work he was doing" and it "gave him an outlet and connected him to his brother." (R. 1562.)

Plaintiff testified about his activities of daily life and mental health impairments at the July 2021 hearing before the ALJ.  (R. 51-64.)  Plaintiff testified that he attended college level courses online with average performance.  (R. 51-53.)  He testified that he started a music podcast, and that he volunteered as a radio station as a DJ.  (R. 53-55.)  Plaintiff testified that his bipolar affective disorder makes it difficult for him to concentrate and sit still.  (R. 62.)  He testified that his anxiety and bipolar affective disorder cause him to have bad days in which it is difficult for him to "get moving" and to "force [him]self to leave the house."  (R. 62-63.)  He testified that he has three to five bad days a month.  (R. 63.)

## C.    State Agency Psychological Consultants' Opinions

State agency psychological consultants assessed Plaintiff in 2018.  (R. 76-105, 110-35.)  They opined that Plaintiff had mild limitations in all four "paragraph B" criteria for mental impairments.  (R. 84-5, 99-100, 117, 130.)  The opinions also noted that Plaintiff was capable of medium exertional work with standing and walking limited to about six hours in an eight-hour workday—consistent with medium work—and postural

limitations of occasionally climbing ladders, ropes, or scaffolds, and ramps and stairs, and frequently balancing, stooping, kneeling, crouching, and crawling.  (R. 86-7, 101-02, 119, 132.)

### III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

15

Under the Act, disability is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). And a "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

Pursuant to §§ 404.1520c and 416.920c of the Social Security Administration's ("SSA") regulations: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). When a medical source provides one or more medical opinions or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment and frequency of examinations, among other factors), (4) specialization, and (5) other factors (for example, when a medical source has familiarity with the other evidence in the claim). 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). The most important factors an ALJ considers when the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). When the medical record in a case is voluminous and

contains multiple medical opinions or administrative findings from a single source, all records from a particular source can be considered as a whole. 20 C.F.R. §§ § 404.1520c(b)(1), 416.920c(b)(1).

The SSA further states:

The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022) ("The 'most important factors' are supportability and consistency.") (citing 20 C.F.R. § 404.1520c(b)(2)).

The SSA has described supportability and consistency as follows:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical

evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at

5853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1).  "An

ALJ's discussion of [a medical source's] treatment and examination notes reflects the

ALJ's consideration of the supportability factor with respect to their opinions."

*Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D.

Minn. May 11, 2023) (citation omitted); *Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL),

2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (addressing the consistency of the

medical source's treatment records with the opinion provided as to functioning in

conjunction to supportability).  "Consistency" denotes "the extent to which the opinion is

consistent with the evidence from other medical sources and nonmedical sources in the

claim."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

## IV.   DISCUSSION

Plaintiff argues that the ALJ failed to, (1) "adequately evaluate the supportability

and consistency of the medical opinion" of gastroenterologist Dr. Levine; (2) "adequately

evaluate the supportability and consistency of the medical opinions" of Nurse Dean-

Gramlich and Therapist Webster; and (3) account for Plaintiff's non-severe mental health

impairments in the RFC.  (Dkt. 11 at 2-3.)  The Court discusses these in turn.

### A.   Supportability and Consistency of Dr. Levine's Medical Opinion

At step two of the sequential evaluation, the ALJ found Plaintiff's Crohn's disease

to be a severe impairment.  (R. 16.)  Plaintiff was treated by gastroenterologist Dr. Levine

prior to the date of alleged disability in December 2017 through September 2019. (R.

755-74, 803-10, 817, 848-50).  As noted previously, in February 2019, Dr. Levine

provided a medical source statement regarding Plaintiff's limitations as a result of

Crohn's disease. (R. 817-21.)  The ALJ summarized that medical source statement as

follows:

> Dr. Levine opined the claimant experienced 1 to 2 days a month of pain or
> other symptoms severe enough to interfere with attention and concentration
> due to Crohn's disease; was able to tolerate moderate work stress, noting
> limitations of flare symptoms to 1 to 2 days per month and access to a
> restroom; could continuously sit for more than 2 hours at one time; could
> continuously stand for more than 2 hours at one time; could sit at least 6
> hours in an 8-hour work day; could stand/walk for at least 6 hours in an 8-
> hour work day; does not need to alternate positions at will; needs a job with
> ready access to a restroom; would need unscheduled breaks during an 8 hour
> work day and would miss 1 to 2 days per month; could occasionally lift and
> carry up to 20 pounds; would have "good days" and "bad days;" and would
> be absent from work due to pain and/or diarrhea about twice a month.

(R. 26.)  The ALJ decision states: "I find Dr. Levine's opinion is not persuasive, as it

overstates the claimant's *limitations*, given the claimant's right hip fracture and left

shoulder degenerative joint disease." (R. 26) (emphasis added).  Plaintiff argues that this

statement is "clearly inaccurate" because the ALJ's RFC assessment is generally more

restrictive on Plaintiff's exertional limitations than Dr. Levine's opinion.  (Dkt. 11 at 16.)

Plaintiff also argues that the ALJ erred by referencing musculoskeletal impairments to

reject Dr. Levine's opinion because as a gastroenterologist, Dr. Levine specifically

indicated the only diagnosis for the basis of his opinion was Crohn's disease.  (Dkt. 11 at

16-17.)

However, as the Commissioner persuasively argues, the remainder of the sentence

combined with the ALJ's generally more restrictive RFC finding than Dr. Levine opined,

shows that the ALJ simply made a scrivener's error.  (R. 26.)  *See Hepp v. Astrue*, 511

F.3d 798, 806 (8th Cir. 2008) ("Consequently, the deficiency does not require reversal since it had no bearing on the outcome.").  Thus, the Court interprets the ALJ's finding to mean that Dr. Levine's 2019 medical source statement was unpersuasive because it overstated Plaintiff's *physical abilities* given Plaintiff's left shoulder degenerative joint disease and hip fracture.

The ALJ then continued:

> Further, Dr. Levine's opinion is not consistent with that provider's treatment notes. Notably, at the claimant's gastroenterology visit in July 2018, Dr. Levine noted the claimant was doing well on azathioprine and Stelara (Ex. 9F/8). Further, at follow up treatment in September 2019, after this medical source statement, Dr. Levine noted the claimant was "doing pretty well" with a combination of medications and exercise (Ex. 15F/6).

(R. 26.)

Plaintiff argues that the ALJ's evaluation of Dr. Levine's opinion was deficient with respect to both the supportability and consistency factors.  *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).  Specifically, Plaintiff asserts that although the ALJ referenced the consistency of Dr. Levine's opinion, the ALJ was really addressing the opinion's supportability.  (Dkt. 11 at 17.)  According to Plaintiff, the consistency factor compares the medical opinion to other medical and nonmedical evidence in the record, while supportability compares the medical opinion to the treatment records and supporting explanations of the opinion provider.  (Dkt. 11 at 17.)  Because the ALJ compared Dr. Levine's opinion to his own treatment records, Plaintiff argues that the ALJ addressed the supportability factor despite referencing consistency.  (*Id.*)  The Court agrees with Plaintiff that regarding the above two sentences, the ALJ's analysis addressed

supportability rather than consistency.   The ALJ compared Dr. Levine's opinion to his own treatment records rather than to other medical and nonmedical evidence in the record.  This means that although the ALJ used the word "consistent," he addressed supportability.  *See* Revisions to Rules, 82 Fed. Reg. at 5853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1); *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023).

Plaintiff further argues that the ALJ's supportability analysis was lacking because the phrase "doing pretty well" is relative, vague, and an insufficient basis for finding Dr. Levine's opinion unpersuasive.  (Dkt. 11 at 18.)  Plaintiff argues that "doing pretty well" to Dr. Levine could have simply meant that Plaintiff was not in the hospital with blood in his stool.  (*Id.*)  Plaintiff argues that the two treatment notes discussed by the ALJ to show that Dr. Levine's opinion was unpersuasive—the July 2018 and September 2019 notes—confirm Plaintiff's ongoing Crohn's disease symptoms.  (*Id.*)  And these symptoms, Plaintiff argues, support Dr. Levine's opinion limitations regarding Plaintiff's "need for ready access to a restroom, unscheduled breaks, as well as absenteeism."  (Dkt. 11 at 18.)  However, contrary to Plaintiff's arguments, the ALJ's discussion of the supportability factor in his analysis of Dr. Levine's opinion is supported by substantial evidence.  As the ALJ noted, in Dr. Levine's July 2018 treatment notes for Plaintiff he stated:

> [Plaintiff] is here for follow-up of his ileocolonic Crohn's disease. He was quite sick in December and was hospitalized at Methodist. Since then, he was much better after getting a prednisone taper. A few months went by before he was able to start Stelara. He started to have some more symptoms. He just received his second dose of Stelara. He believes that it is working quite well.

> The only thing that is not perfect is that he has 4 stools a day instead of 2. He has no more urgency. He will have a little bit of abdominal pain associated with stress. He otherwise reports things are really quite good. He thinks he would be even better if he could change his diet some, and he hopes to do this. He has been cigarette free for over a year.

(R. 806.)  The notes show that "doing pretty well", as noted by the ALJ, did not only mean that Plaintiff was no longer in the hospital with blood in his stool.  To the contrary, the notes state that Plaintiff responded to Prednisone and was doing quite well on Stelara. When Plaintiff "started to have more symptoms" he was given a second dose of Stelara which Plaintiff believed was "working quite well."  (R. 806.)  While the note indicated that Plaintiff was having four stools a day instead of two, it noted that he had no more urgency, that he had been cigarette free for over a year, that he was improving his diet, and that otherwise Plaintiff reported that things were "really quite good."  (R. at 806.) Further, as the September 2019 treatment notes stated:

> [Plaintiff] is here for follow-up of his ileocolonic Crohn's disease. He reports for the most part, he is doing well. He has not been in the hospital for about 20 months. This is a long stretch for him. He attributes this to Stelara working well. He takes this in addition to his azathioprine. Also, he is walking regularly and has quit smoking and drinking. He has 1 to 3 bowel movements a day. The first is definitely more formed. About a third of the time, he has only the stool. He could have more stools later in the day, they are always looser. If he has urgency, it is always with the looser stool. He takes Imodium as needed when he has to travel. This will stop bowel movements for a few hours, but does cause some abdominal discomfort and when the medicine wears off, he has a lot of stool. He took cholestyramine once years ago and is unsure whether it is worthwhile to try again to see if it would help. He was recently diagnosed with neuropathy. It was suspected it is from a combination of smoking and drinking. He, in general, reports that he is doing well. He continues to take 150 mg of azathioprine daily and Stelara every 8 weeks.

(R. 848.)

Similar to the 2018 note, the 2019 note states that the Stelara was working well, and that Plaintiff had not been hospitalized for 20 months which was a long stretch for Plaintiff.  (R. 848.)  According to the note, with the combination of Stelara, azathioprine, regular walking exercise and quitting smoking and drinking, Plaintiff was "doing well." (R. 848.)  He had one to three bowel movements a day—down from the four reported in 2018—and that about one third of the time he had only one stool.  (R. 848.)  The note stated that any urgency occurred later in the day.  (R. 848.)  Ultimately, these notes make clear that the ALJ's supportability decision was supported by substantial evidence.

Plaintiff next argues that the ALJ committed reversible legal error, as the ALJ's analysis of the consistency of Dr. Levine's opinion is "wholly lacking."  (Dkt. 11 at 18.) The Commissioner counters that the ALJ did a consistency analysis when he stated that Dr. Levine's opinion was unpersuasive because it overstated Plaintiff's physical abilities given Plaintiff's left shoulder degenerative joint disease and hip fracture.  (Dkt. 14 at 10.) In his reply brief, Plaintiff argues that this "statement alone is insufficient to meet the ALJ's obligation to clearly articulate the consistency factor" as required by the SSA regulations.  (Dkt. 15 at 2.)  Plaintiff argues that the ALJ failed to "indicate how precisely the presence of [the degenerative joint disease and the hip fracture] would be relevant to an evaluation that was provided by a gastroenterologist specifically relating to Crohn's disease." (Dkt. 15 at 3.)  While no talismanic language is required for the ALJ to meet the requirements of § 404.1520c and § 416.920c, s*ee Diane M. W. v. Kijakazi,* No. 20-CV-2651 (SRN/ECW), 2022 WL 4377731, at *5 (D. Minn. Sept. 22, 2022), the ALJ must provide individuals with an understanding of the ALJ's determinations and

decisions and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017).

The Court finds that the ALJ committed legal error with respect to his analysis of the consistency factor. The Court makes this finding on the basis that the ALJ failed to explain how the hip fracture and degenerative joint disease impacts Dr. Levine's opinion as a gastroenterologist providing his opinion relating only to Plaintiff's Crohn's disease. The most important aspects of Dr. Levine's opinion relate to those things most impacted by the Crohn's diagnosis including Plaintiff's access to a restroom, unscheduled breaks, and absenteeism due to flare-ups. Without this information, the Court finds that the ALJ failed to provide this Court with a sufficient rationale for its review.

The Court also rejects the Commissioner's argument that in this instance the Court should look at the entire written decision by the ALJ to assess whether an opinion's supportability and consistency has been sufficiently analyzed. (Dkt. 14 at 22.) The ALJ did not reference previously explained evidence or findings in the order that would allow the Court to look at the ALJ's entire written decision. Indeed, several courts have concluded that the regulation cannot be satisfied simply because a court can review the entirety of an ALJ's decision and recitation of the facts to craft a post-hoc rationale for the ALJ. *See*, *e.g.*, *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021) ("While the Commissioner argues that [the doctor's] opinion was not consistent with specific other evidence in the record, we will not affirm on this basis, as the ALJ made no such findings."); *Susan H. v. Kijakazi*, No. 21-cv-2688 (ECT/ECW), 2023 WL 2142786, at *3

(D. Minn. Feb. 21, 2023) (sustaining plaintiff's objection that magistrate judge made "'post hoc rationalizations' to explain the ALJ's decision" and remanding because "[t]he ALJ's failure to 'explain how she considered the supportability and consistency factors for a medical source's medical opinions' is legal error" (cleaned up)); *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (sustaining plaintiff's objection to report and recommendation where "[b]oth the Commissioner [in the summary judgment brief] and the magistrate judge described other evidence in the administrative record that could furnish substantial evidence for a nondisability finding and support for rejecting the physicians' opinions" because this approach "ignores the mandate of the regulations that guarantees claimants a certain level of process that cannot be discounted by the substantial evidence test alone").

Finding legal error, the Court remands the opinion to the ALJ with respect to his consistency analysis regarding Dr. Levine's opinion. *Violet G. v. Kijakazi*, No. 21-CV-2105 (TNL), 2023 WL 2696594, at *6 (D. Minn. Mar. 29, 2023) ("[T]he failure to address or adequately explain either the supportability or consistency factors (or both) when evaluating the persuasiveness of a medical opinion warrants remand."). On remand, the ALJ shall reconsider Dr. Levine's February 2019 opinion. If the ALJ finds that Dr. Levine's opinion is unpersuasive, the ALJ shall articulate the reasons therefor, fully addressing the supportability and consistency factors as well as any other relevant factors, "so a reviewing court can make a meaningful assessment of a challenge to [the] ALJ's evaluation of the persuasiveness of ... [the] medical opinion[ ]." *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720 at *9 (E.D. Mo. Aug. 8, 2022). The ALJ shall

fully consider the entire medical record and nonmedical evidence[11] such as Plaintiff's

hearing testimony with respect to the consistency factor specifically relating to Plaintiff's

Crohn's disease at step four.

**B.    Supportability and Consistency of Nurse Dean-Gramlich and Therapist Webster's Medical Opinions**

**1.    The ALJ's Findings at Step Two**

At step two, the ALJ determined that Plaintiff's medically determinable mental

health impairments, including bipolar affective disorder II versus cyclothymia and

generalized anxiety disorder, were non-severe. (R. 17.) To make this finding, the ALJ

relied on the broad functional areas of mental functioning set forth in the disability

regulations for evaluating mental disorders and in the listing of impairments in 20 C.F.R.

part 404, subpart P, appendix 1. These broad functional areas are known as the four

"paragraph B" criteria: (1) understanding, remembering, or applying information,

(2) interacting with others, (3) concentrating, persisting or maintaining pace, and

(4) adapting or managing oneself. 20 C.F.R. part 404, subpart P, appendix 1.

The ALJ found that Plaintiff had no limitations with respect to understanding,

remembering, or applying information and interacting with others. (R. 17.) The ALJ

---

[11]    As discussed in the relevant medical record, Plaintiff's treatment for Crohn's disease was primarily provided by Dr. Levine, and therefore the medical evidence of Plaintiff's Crohn's disease in the record includes mostly treatment notes from Dr. Levine. (R. 751-74, 799-810, 843-50.) However, the record includes notes from additional sources such as PA Lill and Dr. Butner and a provider at the rehabilitation facility when Plaintiff was recovering from hip surgery, which indicate that Plaintiff was treated by others for Crohn's disease. (*See, e.g.*, R. 23, 782-83, 789-94, 862, 1692.) Plaintiff also testified about his symptoms at the hearing. (R. 57-60.)

found that Plaintiff had mild limitations for the categories of concentrating, persisting or maintaining pace, and adapting or managing oneself. (R. 18.) As support for his conclusions, the ALJ found the opinions of the state agency psychologists persuasive. (R. 25.) However, those opinions note that Plaintiff had mild limitations in all four "paragraph B" criteria. (R. 84-5, 99-100, 117, 130.) As an initial matter, Plaintiff argues that the ALJ failed to explain why his determination of Plaintiff's "paragraph B" criteria limitations differed from those of the state agency psychologists, especially when the ALJ found the SAPCs persuasive. (Dkt. 11 at 20-21.) However, assuming without deciding that the ALJ did err by failing to state why he found no limitations for the first two criteria rather than mild limitations like the SAPCs, such a distinction is harmless because mild limitations also indicate that an impairment is non-severe. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe.").

Plaintiff next argues that the ALJ's evaluation of Nurse Dean-Gramlich's and Therapist Webster's opinions was deficient with respect to both the supportability and consistency factors at step two. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ found both opinions unpersuasive. (R. 19.) The Court will address each medical opinion in turn.

### 2.    Nurse Dean-Gramlich

In finding Nurse Dean-Gramlich's opinions unpersuasive, the ALJ stated:

I also find not persuasive the opinions of Vicky Dean-Gramlich, APRN, dated March 29, 2019, and February 7, 2020 (Ex. 13F; 24F). In the medical source statement dated March 29, 2019, [Nurse] Dean-Gramlich opined the

27

claimant has moderate and marked limitations in his ability to sustain mental activities and maintain a productive level of functioning at work or in a home environment; that the claimant would have "good" days and "bad" days; and that the claimant would be absent from work about 3 days a month (Ex. 13F). In the medical source statement dated February 7, 2020, [Nurse] Dean-Gramlich opined the claimant has moderate limitations in his ability to carry out detailed instructions, and has moderate and marked limitations in his ability to respond appropriately to supervision, coworkers, and work pressures in a work setting (Ex. 34F).

(R. 19.)  The ALJ continued:

[Nurse] Dean-Gramlich's opinions are not persuasive, as they are not supported by the record. Notably, [Nurse] Dean-Gramlich offered an opinion in February 2020, but the claimant's last recorded appointment was in December 2019. Further, treatment notes show generally intact mental status exam findings, and PHQ-9 score of 8, and GAD-7 score of 12 (See, e.g., Ex. 21F/4, 7). Furthermore, the claimant reported apparent improvement with medication Aripi[p]razole, reporting 'I have never ever gone this long without crushing paralyzing depression and this episode was moderate this is still okay.' (Ex. 21F/7). Additionally, the claimant has intact activities of daily living, as noted above.

(R. 19.)  Plaintiff argues that the ALJ improperly substituted his lay opinion for that of Nurse Dean-Gramlich when the ALJ concluded that Plaintiff's PHQ-9 and GAD-7 scores were evidence that Nurse Dean-Gramlich's opinions were not supported by her records. Nurse Dean-Gramlich interpreted Plaintiff's PHQ-9 score of an 8 as "moderate" and his GAD-7 score of 12 as "moderate."  (R. 1042.)

However, as the Commissioner argues, the Court finds that the ALJ did not substitute his lay opinion for that of Nurse Dean-Gramlich's because the assessment scores have a pre-set ranking of severity.  The Patient Health Questionnaire ("PHQ-9") score is a depression screening tool.  https://www.ncbi.nlm.nih.gov/pmc/articles/

PMC1495268/ (last visited November 13, 2023). A score of 5-9 indicates mild depression, 10-14 indicates moderate, 15-19 indicates moderately severe, and 20-27 indicates severe. *Id.* Likewise, the Generalized Anxiety Disorder 7-item ("GAD-7") is an anxiety screening tool. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7306644/ (last visited November 13, 2023). A score of 5-9 indicates mild anxiety; 10-14 indicates moderate anxiety; and greater than 15 indicates severe anxiety. *Id.*

Plaintiff next argues that the ALJ's reference to "generally intact mental status exam findings" is impermissibly vague as a supportability analysis because it did not include citations to specific evidence. To support this argument, Plaintiff cites to *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *7 (E.D. Mo. Mar. 24, 2021). (Dkt. 11 at 15.) But *Dornbach* is distinguishable from the ALJ's analysis here. In *Dornbach*, the ALJ found a state agency psychologist's medical opinion persuasive because it was "consistent with the record as a whole." *Id.* However, the *Dornbach* court disagreed, concluding that not only had the ALJ not conducted the requisite supportability and consistency analysis, but also that the psychologist's medical opinions were "based on review of limited medical records and they contradict[ed] the opinions of at least two treating medical sources." *Id.* at *6. Thus, *Dornbach* is distinguishable, including because Plaintiff did not identify any contradictory mental status exam findings, and does not support Plaintiff's argument that the reference to the generally intact mental status exam findings in the treatment notes is impermissibly vague.

Plaintiff also cites to *Mark M. M. v. Saul*, No. CV 19-107-M-KLD, 2020 WL 2079288, at *5 (D. Mont. Apr. 29, 2020), to support the proposition that the ALJ was not

"sufficiently specific" in his supportability analysis for finding Nurse Dean-Gramlich's opinion unpersuasive.  (Dkt. 11 at 15.)  In *Mark M. M.*, the court found: "The ALJ's vague reference to examination findings and medical records 'as documented above' is not a sufficiently specific reason for finding Dr. Payne's opinion unpersuasive."  2020 WL 2079288, at *5.  However, this unpublished opinion from the District of Montana contradicts caselaw from this District and Circuit which permits an ALJ to reference other sections of the ALJ's own decision and therefore incorporate those sections when conducting the supportability and consistency analysis.  *Troy L. M. v. Kijakazi*, No. 21-cv-199 (TNL), 2022 WL 4540107, at *12 (D. Minn. Sept. 28, 2022) (concluding that where an ALJ described an opinion as "inconsistent with [the plaintiff's] daily activities, his relationships with family, and the record as a whole" and had previously discussed those factors, "the ALJ's conclusion regarding the consistency factor—like the supportability factor—must be read in the context of the decision in its entirety"); *Turner v. Kijakazi*, No. 4:20-CV-01713-AGF, 2022 WL 4547021, at *4 (E.D. Mo. Sept. 29, 2022) ("Contrary to [the plaintiff's] assertion, the ALJ did not merely draw these conclusions with no explanation.  The ALJ instead referred explicitly to her extensive, detailed discussion of the medical evidence of record, including [the plaintiff's] consistently normal mental status exams, and [the plaintiff's] activities, which were consistent with [the doctor]'s findings that [the plaintiff] could perform other work with simple, repetitive tasks away from the public.").

Here, the ALJ mentioned the generally intact mental status exam findings in the treatment notes immediately after his lengthy discussion of the evidence in the record

regarding Plaintiff's mental impairments. (*See* R. 17-19.) And during that lengthy

discussion, the ALJ cited Nurse Dean-Gramlich's treatment notes, including the mental

status exam findings, when discussing Plaintiff's "mental status exam findings" in the

supportability context. (R. 18 ("His psychiatric treating provider noted the claimant was

'satisfied with current psychiatric meds' (Ex. 22F/18). Mental status exam findings have

been generally within normal limits, though his psychiatric treating provider notes a wide

range of moods (See, e.g., Ex. 21F/38). Moreover, the record does not contain any

mental health treatment for the last year.").) Thus, the Court concludes that the ALJ's

reference to the "generally intact mental status findings" shown in the treatment notes are

sufficiently specific and supported by the record for the Court to be able to review the

ALJ's supportability determination as to Nurse Dean-Gramlich's opinion.

Plaintiff argues that "there is no reference to the consistency of [Nurse] Dean-

Gramlich's opinion in the ALJ's analysis at all." (Dkt. 11 at 23.) The Court disagrees.

The ALJ concluded that Nurse Dean-Gramlich's opinions were not supported by the

record. (R. 19.) The ALJ also noted Plaintiff's success on medication and referenced his

lengthy discussion of Plaintiff's intact activities of daily living (R. 19) which included:

> [Plaintiff] did not indicate he needs reminders to take care of personal needs
> and grooming. Further, he noted he is able to follow both written and spoken
> instructions "well." In addition, he reported he does not prepare his own
> meals as he lives in a group home and other residents generally prepare the
> meals. However, he is able to perform house work including doing laundry,
> cleaning, and "neatening" up, noting he does not need help or encouragement
> for these tasks. He goes outside 3 to 4 times a week, is able to go out in
> public alone, and is able to use public transportation. He also noted he is
> able to drive but does not have a vehicle. He is able to shop in stores for
> snacks, personal care items, small appliances, prepared/ take-out food,
> books, and clothing. He is able to manage his finances, including paying

> bills, counting change, handling a savings account, and using a checkbook or
> money order. He noted he goes to the library, Target, and Walmart on a
> regular basis, from 2 to 3 times a month. In a work form dated June 15, 2018,
> the claimant indicated no problems with memory, concentrating, or
> psychomotor speed (Ex. 26F/30). Furthermore, he was also studying and
> taking college level courses in 2020, and per testimony, he completed his
> courses with average performance (Hearing Record). He also created and
> posted a podcast (Hearing Record; Ex. 23F/3; 25F/4; 26F/6). Moreover, he
> testified to volunteering at a radio station, and was currently in training
> (Hearing Record).

(R. 17-18.) While the ALJ did not use the word "consistency" or "consistent", he

addressed that factor because he compared Nurse Dean-Gramlich's opinion to other

medical and nonmedical information in the record. *See* Revisions to Rules, 82 Fed. Reg.

at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). As stated previously, there is no

requirement that the ALJ use specific language in its analysis of consistency or

supportability. *See Diane M. W.*, 2022 WL 4377731, at *5 (finding no talismanic

language is required for the ALJ to meet the requirements of § 404.1520c and

§ 416.920c). Thus, the Court finds that the ALJ adequately addressed the consistency

factor.

### 3. Therapist Webster

Plaintiff next argues that the ALJ's analysis of Therapist Webster's opinion was

"cursory at best" and that the ALJ failed to provide any specific evidence for

supportability or consistency. (Dkt. 11 at 23.) The ALJ discussed the March 2019

opinion of Therapist Webster (R. 823-28) "that the claimant had moderate limitations in

his ability to complete a normal work day and work week and to tolerate normal levels of

stress; that the claimant would need unscheduled breaks; and that the claimant would be

absent from work about 1 day per month (Ex. 12F)." (R. 19.) The ALJ found Therapist Webster's opinions unpersuasive because: "As with [Nurse] Dean-Gramlich's opinion, discussed above, this opinion is not consistent with or supported by the record, including the generally intact mental status findings, generally mild PHQ-9 and GAD-7 scores, and intact activities of daily living. Thus, this opinion is not persuasive." (R. 19.)

Plaintiff asserts the ALJ made only summary conclusions without providing the evidence that he relied on to reach those conclusions. (Dkt. 11 at 23.) Plaintiff argues that instead, the ALJ improperly referred to the evaluation of Nurse Dean-Gramlich when the SSA regulations require the ALJ to evaluate the persuasiveness of every medical opinion. (*Id*.)

The Commissioner counters that the ALJ appropriately referred to his analysis of Nurse Dean-Gramlich's opinion because an ALJ can reference previously discussed evidence. (Dkt. 14 at 13-14.) Moreover, the Commissioner argues, the ALJ rejected Therapist Webster's opinion for the same reasons that it rejected Nurse Dean-Gramlich's opinion, namely, because it was inconsistent with Plaintiff's generally intact mental status exam findings, Plaintiff's PHQ-9 and GAD-7 scores, and Plaintiff's activities of daily living. (Dkt. 14 at 13-14; R. 19.)

The Court agrees with the Commissioner that the ALJ did not make only summary conclusions and provided sufficient evidence to support his conclusions. As noted, an ALJ may reference other sections of his or her opinion when analyzing the supportability and consistency of a medical opinion. *See Troy L. M.*, 2022 WL 4540107, at *12; *Turner*, 2022 WL 4547021, at *4. Here the ALJ referenced his discussion of Nurse

Dean-Gramlich's opinion and rejected Therapist Webster's opinion for the same reasons:
her opinion was "not consistent with or supported by the record, including the generally
intact mental status findings, generally mild PHQ-9 and GAD-7 scores, and intact
activities of daily living." (R. 19.) This explanation is sufficient to meet the
supportability and consistency requirements.

Plaintiff next argues that the ALJ's analysis of Nurse Dean-Gramlich and
Therapist Webster's opinions is not supported by substantial evidence because Plaintiff
did not have "generally intact mental status exam findings." (Dkt. 11 at 24.) Plaintiff
points to records about his mental impairments including anxiety and depression with
current suicidal ideations from before the disability onset date.[12] (*Id.*) Plaintiff argues
that the medical evidence shows that he continued to struggle with mood-related
symptoms throughout the relevant period. (*Id.*) Plaintiff points to multiple places in the
record where his mood is described as sad, depressed, anxious, irritable, labile, and
apathetic, as well as his affect being described as angry fearful, anxious, depressed,
irritable, agitated, and withdrawn. (*Id.* at 24-15.)

However, as the Commissioner argues, the ALJ recognized Plaintiff's wide range
of moods (R. 18) but still concluded that the moods did not appear to cause any
limitations in Plaintiff's functioning. The Commissioner points to multiple places in the
medical record where Plaintiff is described as having a generally full affect, cooperative

---

[12]    The Court notes that "[r]ecords and medical opinions from outside the insured
period can only be used in 'helping to elucidate a medical condition during the time for
which benefits might be rewarded.'" *Bannister v. Astrue*, 730 F. Supp. 2d 946, 951 (S.D.
Iowa 2010) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)).

behavior, and intact attention, memory, insight, concentration, and judgment, which is supported by substantial evidence in the records as whole. (Dkt. 14 at 14; R. 1042, 1050-51, 1059-60, 1067, 1076, 1084-85, 1094, 1102-03, 1111-12, 1120, 1128, 1136, 1144, 1153, 1162, 1172, 1226-52, 1265-94, 1297-03, 1311-37, 1341-1536.) Moreover, as the ALJ discussed at length, Plaintiff's activities of daily living were intact. (R. 17-18.) Plaintiff reported taking college level courses with average performance, starting and maintaining a podcast, volunteering at a radio station, shopping at stores and maintaining his finances independently, and engaging in activities that challenged his mind. (*See, e.g.*, R. 369-76, 395-402.)

After careful review of the record, including Nurse Dean-Gramlich's mental status findings, Therapist Webster's progress notes, the Rise, Inc. progress notes, and the hearing record, the Court concludes that the record as a whole supports the ALJ's finding that Nurse Dean-Gramlich and Therapist Webster's opinions were unpersuasive.

Although the evidence also supports Plaintiff's position that Therapist Webster's opinion could have been considered persuasive, this Court does not reweigh the evidence presented to the ALJ. *See Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) ("[i]t is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue[s] ... de novo") (citing *Loving v. Dep't of Health & Human Servs.*, 16 F.3d 967, 969 (8th Cir. 1994)). Because substantial evidence supports the ALJ's decision, the Court will not reverse it merely because substantial evidence would have supported a contrary outcome. *See id.*

35

**C.      Non-Severe Impairments in the Residual Functional Capacity Assessment**

Plaintiff argues that the ALJ erred by failing to account for Plaintiff's non-severe mental impairments in the RFC assessment.  (Dkt. 11 at 27.)  When conducting an RFC assessment, the ALJ must consider not only those impairments that were found to be severe, but also those which were determined to be non-severe.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Mark E. v. Kijakazi*, No. 20-CV-2047 (PAM/JFD), 2021 WL 6066260, at *9 (D. Minn. Dec. 7, 2021), *R. & R. adopted sub nom.*, 2021 WL 6063631 (D. Minn. Dec. 22, 2021) ("At step four of the sequential evaluation, the ALJ considers all severe and non-severe impairments together.").

Plaintiff argues that the ALJ failed to consider the mental health impairments at step four because there are no mental limitations included in the RFC assessment.  (Dkt. 11 at 27-28.)  Plaintiff asserts that at no point in step four does the ALJ mention any of Plaintiff's mental impairments, nor is there a summary of any of the mental health treatment provided by Nurse Dean-Gramlich or Therapist Webster.  (Dkt. 11 at 28.)  Plaintiff also argues that this error was not harmless because had the non-severe impairments been considered, the limitations contained in Nurse Dean-Gramlich's and Therapist Webster's opinions as to those impairments included absences from work.  (Dkt. 11 at 28-29.)  At the hearing, the Vocational Expert ("VE") testified that such absences would preclude work.  (R. at 71.)

The Commissioner counters that the ALJ did consider Plaintiff's non-severe mental impairments when evaluating the RFC.  (Dkt. 14 at 17.)  The Commissioner points to the ALJ's statement as part of his step two analysis that, "I considered all of the

claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Dkt. 14 at 17 (citing R. 17).) The Commissioner notes that the ALJ explained further:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Dkt. 14 at 17 (citing R. 19).) Thus, the Commissioner argues that the ALJ made it clear that he considered Plaintiff's mild limitations of concentrating, persisting, or maintaining pace and adapting or managing himself when determining the RFC, and implicitly found that these mild limitations did not warrant RFC-level restrictions. (Dkt. 14 at 17-18 (citing R. 18-19).)

However, as Plaintiff argues on rebuttal, this is an improper post hoc rationalization for the ALJ's failure to include Plaintiff's mild mental impairments in the RFC or explain their omission. *See Bonnett*, 859 F. App'x at 20 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), for the proposition that a reviewing court may not uphold an agency decision based on reasons not articulated by the agency itself in its decision); *see also Vicky R. v. Saul*, No. 19-CV-2530 (ADM/ECW), 2021 WL 536297, at *14 (D. Minn. Jan. 28, 2021), *R. & R. adopted sub nom.*, 2021 WL 533685 (D. Minn. Feb. 12, 2021) (collecting cases) ("[T]he mild mental limitations found by the ALJ should have been incorporated into the RFC determination or a reason provided for their omission. . . .").

Here, the ALJ "wholly ignore[d]" Plaintiff's mild mental impairments when determining Plaintiff's RFC, resulting in error. *Kasey K. v. Kijakazi*, No. 22-CV-2029 (WMW/DLM), 2023 WL 5754115, at *4 (D. Minn. July 13, 2023), *R. & R. adopted*, No. 22-CV-2029 (WMW/DLM), 2023 WL 5624007 (D. Minn. Aug. 31, 2023) (collecting cases) ("Of course, error attaches where an RFC determination wholly ignores a person's mental impairments."). Nowhere within the ALJ's RFC determination is there a reference to Plaintiff's mild mental impairments. (*See* R. 21-26.) Indeed, while the ALJ asserted at step two that he considered the non-severe impairment as part of the RFC, he specified that the analysis as part of step two with respect to mental impairment was different. (R. 19.) The ALJ acknowledged that "a more detailed assessment" with respect to the RFC was needed, but such an assessment was inexplicably missing from the ALJ's RFC determination for Plaintiff. (*Id*.) Further, this omission is especially puzzling because at the hearing the ALJ questioned the VE about Plaintiff's ability to perform past work based on interpersonal limitations. (R. 70-72.) The testimony of the VE is as follows:

> ALJ: And then if the individual was further limited to superficial interaction with others, such as taking instructions and responding to requests for help, relaying information, and like team lifting, but they couldn't perform actions, such as supervising or mentoring, would those interpersonal limitations preclude the past work?

> VE: Yes, Your Honor. If the hypothetical individual is limited to only superficial interaction, that would be work preclusive to the past work.

> ALJ: Give me just one more moment here. I do have one last hypothetical, you'll excuse me. I should've structured these in a different way, but I'm wanting to address the period before the Claimant's hip injury. I'd like you to do some further review of the file to see what sort of mental health limits

are supported prior to the hip injury on February 17 of 2020. So let me post this hypothetical. Assuming an individual who is between the ages of 50 and 55 with the Claimant's past work history that we've already discussed. And then having the limits from that first hypothetical that I related, being able to perform at the medium exertion level with occasional climbing, frequent balancing, stooping, kneeling, crouching, and crawling, as before, requiring that ready access to the restroom, and then having the interpersonal limitations of being able to engage in interactions with others, such as taking instructions, responding to requests for help, relaying information, and team lifting, but not able to perform things, such as supervising or mentoring others. And so you just indicated that that last limitation would preclude the past work, but would there be any other work that you're familiar with that would be consistent with the physical limits that I've just posed and that I copied over from that first hypothetical, and then these interpersonal limitations here that I've just posed?

VE: Sure, Your Honor. So I did do a transferrable skills analysis on the two jobs that we talked about and taking into consideration the rules that there must be very little to any vocational adjustment, in terms of tools, work processes, work settings or industry for transferability of skills. The skills that this person would have acquired doing those jobs, would not transfer to another job, so there would be no work for these -- for the skills acquired.

ALJ: Okay. Other type of occupations would require similar levels of interpersonal interactions that -- you know, that which eliminated the jobs the Claimant actually did, would likely eliminate any comparable jobs. Is that right?

VE: That is correct, Your Honor, yes.

ALJ: Okay. But for an individual that is less than age 55 and capable of performing this subset of medium work, would there be other jobs, other entry level jobs that you're familiar with that could be performed?

VE: Yes, Your Honor. If you just give me one second.

ALJ: Certainly.

VE: Your Honor, this hypothetical individual could perform work as a hand packager. That is DOT 920.587-018. That is SVP 2. That is medium per the DOT with approximately 109,000 jobs in the national economy. That person could perform work as a laborer stores. That is DOT 922.687-058. That is SVP 2. That is medium per the DOT with approximately 48,000 jobs

39

in the national economy.  And that person could perform work as a cleaner. That is DOT 381.687-018.  That is SVP 2.  That is medium per the DOT with approximately 108,000 jobs in the national economy.

(R. 70-72.)  Although the ALJ felt it was necessary to propound hypothetical questions taking Plaintiff's mild mental limitations into account, the ALJ failed to explain why he omitted those limitations from the RFC.  It is true that a hypothetical question need only include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole.  *See Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (a properly phrased hypothetical includes limitations mirroring those of claimant); *see also Lacroix*, 465 F.3d at 889 ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).  But the ALJ's analysis must provide the Court the opportunity for meaningful judicial review.  *Kasey K.*, 2023 WL 5754115, at *4; *Vicky R.*, 2021 WL 536297, at *14; *Mark E. v. Kijakazi*, 2021 WL 6066260, at *10; *Charles C. v. Kijakazi*, No. 22-cv-2054 (JWB/DJF), 2023 WL 4215310, at *8-9 (D. Minn. May 22, 2023), *R. & R. adopted*, 2023 WL 4202850 (D. Minn. June 27, 2023).

Finally, as the VE testified, including interpersonal limitations in Plaintiff's RFC would have precluded Plaintiff from performing his past relevant work as well as any comparable jobs.  (R. 71.)  However, as noted, the VE testified that when excluding interpersonal limitations in Plaintiff's RFC, Plaintiff could perform other entry level jobs that were available in the national economy.  (R. 71-72.)   The Court recommends remand as to step four so the ALJ can revisit the extent to which Plaintiff's mental

impairments should be incorporated into the RFC and sufficiently explain his rationale for their inclusion or exclusion.  If the new RFC includes limitations for Plaintiff's mental impairments, the ALJ also will need to reconsider step five, including obtaining new testimony from the VE.  *See Vicky R.*, 2021 WL 536297, at *14 ("A hypothetical question need . . . include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole.").

\*\*\*

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment be granted in part and the Commissioner's Motion for Summary Judgment be denied.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that**:**

1.    Plaintiff's Motion for Summary Judgment (Dkt. 11) be **GRANTED in part**;

2.    The Commissioner's Motion for Summary Judgment (Dkt. 13) be **DENIED**; and

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.

DATED:  November 13, 2023              *s/Elizabeth Cowan Wright*
                                                            ELIZABETH COWAN WRIGHT
                                                            United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).